J-S77005-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMAR MATTHEWS | : | |
| | : | |
| Appellant | : | No. 3922 EDA 2017 |

Appeal from the PCRA Order October 30, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0003979-2014

BEFORE:   OTT, J., DUBOW, J., and STRASSBURGER[*], J.

MEMORANDUM BY OTT, J.:                    **FILED MARCH 07, 2019**

Jamar Matthews appeals, *pro se*, from the order entered October 30, 2017, in the Philadelphia County Court of Common Pleas, dismissing his first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  Matthews seeks relief from the judgment of sentence of an aggregate term of 13 to 26 years' imprisonment, imposed June 26, 2015, following his jury conviction of attempted murder, conspiracy, and related charges[2] for a November, 2013 attack on Enoch Carter.  On appeal, Matthews contends the PCRA court abused its discretion when it failed to grant him an evidentiary hearing on his claims that: (1) trial counsel was ineffective for failing to object to prosecutorial

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  **See** 42 Pa.C.S. §§ 9541-9545.

[2] **See** 18 Pa.C.S. §§ 901/2502 and 903, respectively.

misconduct, (2) trial counsel was ineffective for failing to challenge an illegal search and seizure, and (3) the trial court failed to issue a limiting instruction regarding the jury's consideration of a statement by his co-defendant which implicated him in the crime. For the reasons below, we affirm.

The trial testimony leading to Matthews' conviction was summarized by a prior panel of this Court as follows:

> [O]n November 29, 2013, at approximately 9:45 p.m., [Philadelphia Police Officer Milord Celce] received a radio call for a shooting and person with a gun at 2603 West Harold Street in Philadelphia. Officer Celce, who was approximately four (4) blocks away at the time, promptly arrived at the above location, where he observed bullet holes in the windows and encountered the complainant, Enoch Carter. Based on his conversation with Mr. Carter, they proceeded to 2642 North 26th Street—literally just around the corner, not even 30 seconds later—where they met Highway Patrol Officer Reid, and knocked on the door. [Matthews], who was in a wheelchair, answered the door; his cohort, Co-Defendant Karie Dozier (hereinafter "Dozier"), was seated on a couch directly facing the front door of the residence. As soon as Mr. Carter saw Dozier, he yelled and pointed to him, [t]hat's the guy.
>
> Officer Celce placed Dozier on the floor to detain him. He lifted the cushion where Dozier was sitting and recovered a handgun; Dozier was sitting on the gun. Officer Celce escorted Dozier outside, where he was positively identified by Mr. Carter, and took him into custody. Mr. Carter also was transported to Central Detectives for an interview, during which Officer Celce learned of [Matthews'] involvement; he then went back to the residence and placed [Matthews] under arrest at 12:15 a.m.
>
> .... Mr. Carter testified that, prior to the shooting, he had lived around the corner from [Matthews] for approximately one and one-half (1 1//2) years and was friends with him. Mr. Carter used to hang out with [Matthews] frequently, and also helped him with chores such as laundry and grocery shopping. Several weeks before the shooting, on October 17, 2013, [Matthews] was driving a van (with handicapped hand controls) in which Mr. Carter and a

female friend of [Matthews] were riding as passengers. Approaching a red light, [Matthews] mistook the accelerator for the brakes, and crashed into a building, injuring Mr. Carter and the female. [Matthews] was arrested at the scene for his involvement in the crash. Mr. Carter was transported to the hospital via ambulance for treatment and subsequently required physical therapy for his injuries. Several weeks later, Mr. Carter commenced a personal injury lawsuit against [Matthews], which [Matthews] took to heart. [Matthews] thereafter had several different individuals approach Mr. Carter to persuade him to "drop" the lawsuit, including a younger gentleman earlier on the day of the shooting, who proposed a fistfight in front of [Matthews'] residence. Mr. Carter declined the proposal and went home.

Later that evening, at approximately 9:40 p.m., Co-Defendant Dozier knocked on Mr. Carter's door. Mr. Carter stuck his head out of his second-story window to see who it was. Dozier asked him why he had a beef with [Matthews]; Mr. Carter explained that he did not have a problem with [Matthews], it was [Matthews] who had a problem with him due to the lawsuit. After speaking with Dozier for five (5) to seven (7) minutes, [Matthews] approached on his wheelchair and parked it next to Dozier. Dozier then asked [Matthews], "what do you want me to do[?]" at which point [Matthews] said "go ahead[.]" Right on cue, Dozier retrieved a black handgun, pointed it at Mr. Carter and opened fire. Mr. Carter saw the flash from the gun, and a bullet went through his window; he fell back into the home. As he was falling, Dozier fired several more shots at him. Fortunately, none of the bullets struck Mr. Carter, who immediately dialed 911 to summon police. During the call, he provided a physical description of Dozier and reported [Matthews'] involvement. A few minutes later, he accompanied police to [Matthews'] residence, where Dozier and the handgun were taken into custody following Mr. Carter's positive identification.

.... [Ballistics expert and] Philadelphia Police Officer Jesus Cruz testified that he test-fired the handgun that Dozier was sitting on and compared the fired cartridge casing ("FCC") with the five (5) FCCs recovered in front of Mr. Carter's residence. Based on his analysis, which was peer-reviewed, he concluded to a reasonable degree of scientific certainty that each of the five (5) FCCs recovered at the scene was, in fact, fired from Dozier's handgun.

... Philadelphia Police Detective Michael Repici ... testified that, on November 29, 2013, he was assigned to investigate this matter. At approximately 11:35 p.m., he interviewed Mr. Carter at Central Detectives. When Mr. Carter described [Matthews'] involvement, Detective Repici asked Officer Celce—who was present—if he knew where this guy is? Officer Celce responded, [y]eah, he's still back there, at which point Detective Repici directed him to arrest [Matthews]. Officer Celce embarked on this quest a few minutes prior to 12:00 a.m.

Detective Repici then went to the crime scene, 2603 Harold Street, which was being held, or secured, by fellow officers. There, he recovered under property receipt four (4) FCCs on the pavement and one (1) FCC in the street, all in close proximity to each other in front of Mr. Carter's residence. He also took photographs of all the evidence, including the bullet holes in the windows and inside the residence, which he described as the photos were displayed to the jury. Detective Repici then proceeded to 2642 North 26th Street, where he took photographs of the couch and black handgun, the latter of which he recovered under property receipt.

Finally, the Commonwealth introduced via stipulation: (a) certificates of non-licensure with respect to both [Matthews] and Dozier, establishing that neither male was licensed to carry a firearm and thus not permitted to carry a firearm in Pennsylvania; (b) authenticity of prison phone call records between [Matthews] and Dozier, in which they discuss methods to prevent the case from going forward—which recordings were played for, and their transcripts displayed to, the jury.

*Commonwealth v. Matthews*, 153 A.3d 180 [2468 EDA 2015, at *1-2] (Pa. Super. 2016) (unpublished memorandum) (citation omitted).

Matthews proceeded to a joint jury trial with co-defendant Dozier. On April 23, 2015, he was convicted of attempted murder, criminal conspiracy to commit murder, aggravated assault, persons not to possess firearms, carrying a firearm without a license, carrying a firearm on a public street in

Philadelphia, and possession of an instrument of crime.[3]   Matthews was sentenced to an aggregate term of 13 to 26 years' imprisonment on June 26, 2015.  He filed a post-sentence motion, which was denied by the trial court, followed by a timely direct appeal.  ***See Matthews***, ***supra***.  A panel of this Court affirmed his judgment of sentence, and, on March 15, 2017, the Pennsylvania Supreme Court denied Matthews' petition for allowance of appeal.  ***See Commonwealth v. Matthews***, 169 A.3d 11 (Pa. 2017).

On July 20, 2017, Matthews filed a timely, *pro se*, PCRA petition in which he challenged trial counsel's ineffectiveness for:   (1) failing to seek suppression of the firearm recovered during an illegal search; (2) failing to raise a claim of prosecutorial misconduct when the Commonwealth presented perjured testimony from the responding and investigating officers; (3) failing to object to the introduction of his co-defendant's statement implicating him in the crime, and failing to request a curative instruction; and (4) failing to object to improper comments by the prosecutor during closing argument.  ***See*** Motion for Post Conviction Collateral Relief, 7/20/2017, at 6a.  Matthews also argued the trial court committed "reversible error when it failed to issue a curative instruction to the jury[.]"  ***Id.***   Although counsel was promptly

---

[3] ***See*** 18 Pa.C.S. §§ 901/2502, 903, 2702, 6105, 6106, 6108, and 907 respectively.

appointed, she later filed a petition to withdraw, accompanied by a *Turner*/*Finley*[4] "no merit" letter, on September 21, 2017.

On September 25, 2017, the PCRA court sent Matthews notice of its intent to dismiss his petition without first conducting an evidentiary hearing pursuant to Pa.R.Crim.P. 907. Matthews did not respond directly to the court's Rule 907 notice, but rather, filed a motion for extension of time, a motion for the transcripts, and a petition for leave to amend his PCRA petition. On October 30, 2017, the PCRA court entered an order dismissing Matthews' petition, and permitting counsel to withdraw. This timely *pro se* appeal followed.[5]

---

[4] *See Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988), and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[5] Shortly after filing his appeal, Matthews filed several *pro se* motions seeking the relevant transcripts and other discovery to aid him in filing his appellate brief. On January 29, 2018, this Court entered an order remanding the appeal to the PCRA court to provide Matthews with the relevant documents. *See* Order, 1/29/2018. Meanwhile, unaware of this Court's remand, on January 30, 2018, the PCRA court directed Matthews to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Matthews filed a concise statement on February 20, 2018, a petition to file a supplemental statement on February 27, 2018, and a supplemental statement on March 2, 2018. After receiving assurance that all the discovery and transcripts were turned over to Matthews, on March 29, 2018, this Court permitted Matthews to file a supplemental concise statement, and directed the PCRA court to file a supplemental opinion if necessary. *See* Order, 3/29/2018. Ultimately, Matthews filed a supplemental concise statement in November 2018, and the PCRA court filed a supplemental opinion in response. *See* PCRA Court Opinion, 12/4/2018, at 3.

Our standard of review, when considering the denial of PCRA relief, is well settled. "In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." ***Commonwealth v. Mitchell***, 141 A.3d 1277, 1283–1284 (Pa. 2016) (internal punctuation and citation omitted). Further, "a PCRA court may decline to hold a hearing on the petition if petitioner's claim is patently frivolous or lacks support from either the record or other evidence." ***Commonwealth v. duPont***, 860 A.2d 525, 530 (Pa. Super. 2004) (citation omitted), *appeal denied*, 889 A.2d 87 (Pa. 2005), *cert. denied*, 547 U.S. 1129 (2006).

Matthews' first two issues assert the ineffective assistance of trial counsel. In order to obtain relief based upon an allegation of trial counsel's ineffectiveness, a PCRA petitioner must demonstrate: "(1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's ineffectiveness prejudiced him." ***Commonwealth v. Michaud***, 70 A.3d 862, 867 (Pa. Super. 2013). Moreover, we presume counsel provided effective assistance, and "place upon the appellant the burden of proving otherwise." ***Id.***

In his first issue, Matthews contends the PCRA court abused its discretion when it declined to hold an evidentiary hearing on his claim that trial counsel was ineffective for failing to object to prosecutorial misconduct. Specifically, he claims the Commonwealth withheld evidence and permitted its witnesses to provide perjured testimony. ***See*** Matthews' Brief at 1-9.

Matthews insists Officer Celce provided "false information" regarding his recovery of the firearm in Matthews' home. *Id.* at 2. Although the officer "led the court to believe that, the gun was found in 'plain view' after he removed [the] co-defendant (Dozier) from the couch," his trial testimony revealed that he actually lifted a cushion to retrieve the gun, and that another witness, an unidentified female, was present in the room. *Id.* Matthews emphasizes, however, that none of these facts were "in any official report." *Id.* Furthermore, Matthews contends Detective Repici conspired with Officer Celce to cover-up "evidence of a bad search." *Id.* at 6. He claims the detective knew Officer Celce removed the gun from a hole in the couch, but allowed his interview with Officer Celce to be submitted into evidence. In that interview, Officer Celce stated that he "saw a firearm on the couch" after he picked up Dozier. *Id.* Indeed, Matthews maintains that "[b]oth officers have falsified statements, and withheld evidence of an illegal search." *Id.* at 7. Furthermore, he insists they "deceptively applied for a warrant for a gun that they already had in their possession." *Id.* at 5.

Matthews' assertions raise an allegation that the Commonwealth committed prosecutorial misconduct by withholding evidence and presenting false testimony in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In order to establish a *Brady* violation, a petitioner must demonstrate:

> (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant. The burden rests with the

defendant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution."

> To demonstrate prejudice, "the evidence suppressed must have been material to guilt or punishment." Evidence is material under *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the trial could have been different. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense." The relevant inquiry is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Additionally, "[a] reviewing court is not to review the evidence in isolation, but, rather, the omission is to be evaluated in the context of the entire record."

*Commonwealth v. Antidormi*, 84 A.3d 736, 747-748 (Pa. Super. 2014) (internal citations omitted), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Matthews' *Brady* claim centers on perceived omissions in the police reports he received before trial. As noted above, he insists the trial testimony of both Officer Celce and Detective Repici differed from the information in their official reports, and either the pretrial omissions were purposeful so as to deny him a fair trial, or the officers' trial testimony was false. His argument focuses on the following "facts:" (1) Officer Celce "created a witness that did not exist" in his trial testimony;[6] (2) Officer Celce led the court to believe the gun was in "plain view" after Dozier was removed from the couch, when he had told Detective Repici it was "inside a hole in the couch;"[7] (3) the

---

[6] Matthews' Brief at 4.

[7] *Id.* at 2, 5.

Commonwealth submitted Officer Celce's statement into evidence knowing it was false;[8] and (4) Detective Repici knew the gun was in the possession of police when he applied for the search warrant.[9]  Our review of the record, however, fails to reveal any material omissions or potentially false statements that prejudiced Matthews' preparation of his defense.

With regard to the missing female witness, we note Officer Celce acknowledged during cross-examination that he did not file a report on the woman, nor did he mention her to Detective Repici.  *See* N.T., 4/21/2015, at 143-144.  He further explained that he "didn't have her stopped" because he was focused on Dozier.  *Id.* at 144.  Officer Celce stated that one of the other "multiple units in the house" should have filed a report on her, but he did not know if they did.  *Id.*  Although he did not have her name, he testified the female told him she lived upstairs.  *See id.*  Therefore, the officer admitted he neglected to reference the female in any of his paperwork.  Nevertheless, Matthews fails to demonstrate how this omission was material to his trial or defense.  The Commonwealth did not attempt to call her at trial, and there is no allegation she would have provided testimony favorable to Matthews so that had her presence been disclosed, "there is a reasonable probability that,

---

[8] *See id.* at 6.

[9] *See id.* at 5.

… the result of the trial could have been different." ***Antidormi***, ***supra***, 84 A.3d at 747.

With regard to the recovery of the firearm, we agree Officer Celce's trial testimony differed somewhat from the statement he gave to Detective Repici. In his statement, Officer Celce said: "[W]e go to cuff [Dozier] and he [was] still on the couch. We cuffed him up and then we picked him up off the couch and at that time I see a firearm on the couch." Trial Exhibit C4, Officer's Interview Report, 12/17/2013, at 1. At trial, however, Officer Celce elaborated that after he grabbed Dozier, he "went to the area [on the couch] where [Dozier] had his hand, … [l]ifted up the couch cushion and there was a handgun right there." N.T., 4/21/2015, at 92. The officer acknowledged that while his interview read as if Dozier was sitting on the gun, the firearm was actually situated underneath the cushion, although he stated he "could see [it] without having to move any couch cushions[.]" ***Id.*** at 131, 134-135. Later at trial, Detective Repici identified a crime scene photo of a hole in the couch, stating "[t]his is where the gun was originally." N.T., 4/22/2015, at 158. When asked how he knew the gun was inside the hole, the detective replied, "[t]he officers told me." ***Id.*** However, during cross-examination by co-defendant Dozier's counsel, Detective Repici corrected his testimony and stated Officer Celce told him "he recovered the gun in the couch[,]" but the detective could not "specifically say where exactly [Officer Celce] found it from the couch." ***Id.*** at 168. Although counsel pressed him on this purported change in testimony, the detective insisted he did not remember if Officer

Celce "said he found it inside the hole of the couch or under the pillows … in the couch." *Id.* at 169.

Again, Matthews has not demonstrated the Commonwealth either withheld material evidence, or presented perjured testimony. While Officer Celce's trial testimony differed somewhat from his pretrial statement, we note that the statement was very brief, and did not specify how he recovered the firearm. His testimony at trial, however, was more detailed, and not entirely inconsistent. Dozier's counsel cross-examined both Officer Celce and Detective Repici extensively regarding the perceived differences in their trial testimony and the official reports. There is simply no support for Matthews' claim that the officers lied during their testimony about any material fact, or purposefully withheld information from their official reports, much less that the Commonwealth was aware they did so.

Furthermore, with regard to Matthews' assertion that the firearm was in police custody at the time Detective Repici applied for the search warrant, we find no support for this claim. *See* Matthews' Brief at 4. Matthews avers the Carter "confirm[ed]" in his testimony that both the gun and Dozier were transported to the police station. *Id.* However, the testimony that he cites does not support this assertion. Indeed, Carter was asked why he did not initially tell the police about Matthews' role in the shooting. *See* N.T., 4/22/2015, at 71. He replied:

I did not tell the police at that time.

> They [were] more concerned about getting the gun and who was the shooter.
>
> Once they grabbed the gun and the shooter, they took him down [to] the station. They took me down [to] the station.

*Id.* Contrary to Matthews' claim, Carter did not testify the police took the firearm to the police station when they left his home. Rather, Officer Celce explained that after he grabbed the gun, he held it for the detectives. *See* 4/21/2015, at 99. Later, Detective Repici stated that when he executed the search warrant, he recovered the gun from a small table in Matthews' home. He explained: "The officers had told us that they had it on there because there was another male in the house at the same time [*i.e.*, Matthews] and they wanted to make sure it was safe." N.T., 4/22/2015, at 156. There was simply no testimony indicating the gun was transported to the police station prior to the execution of the search warrant. Therefore, because Matthews' allegations of the Commonwealth's *Brady* omissions and fabricated testimony are not supported by the record, we find the PCRA court did not abuse its discretion when it denied Matthews an evidentiary hearing on this claim.

Next, Matthews argues trial counsel was ineffective for failing to challenge the illegal search of his residence. *See* Matthews' Brief at 10-14. He contends "the police had no probable cause to enter [his] home, or make an arrest, and therefore, anything that was found after the illegal entry and arrest, [is] inadmissible and fruits of a poisonous tree." *Id.* at 11. Moreover, he avers Officer Celce then conducted a warrantless search when he lifted up the couch cushion and found the firearm. *See id.* at 12. Matthews insists

there were no "exigent circumstances" to permit this search, and complains Detective Repici falsified the search warrant affidavit since he knew the gun had already been transported to the police station for processing.[10] ***See id.*** Accordingly, Matthews argues trial counsel was ineffective for failing "to move for the suppression of the evidence collected from [his] residence." ***Id.*** at 13. We find this issue has no arguable merit.[11]

It is axiomatic that both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures of their residence. ***See Commonwealth v. Richter***, 791 A.2d 1181, 1184 (Pa. Super. 2002) (*en banc*). Consequently, a search warrant is generally required to conduct a search of a home, and "[a]bsent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable." ***Commonwealth v. Caple***, 121 A.3d 511, 517 (Pa. Super. 2015), *appeal denied*, 179 A.3d 7 (Pa. 2018). One such exception is exigent circumstances.

> The exigent circumstances exception to the warrant requirement recognizes that some situations present a compelling need for

_____

[10] As noted *supra*, this allegation is not supported in the record.

[11] We note the certified record contains a pretrial motion to suppress filed by Matthews' counsel on April 16, 2015, less than a week before trial. However, it does not appear the motion was ever ruled upon, and it was not referred to during the pretrial hearing on April 20, 2015. Therefore, for our purposes, we will presume counsel abandoned the motion, and proceed as if none was ever filed.

instant arrest, and that delay to seek a warrant will endanger life, limb or overriding law enforcement interests. In these cases, our strong preference for use of a warrant must give way to an urgent need for immediate action.

In determining whether exigent circumstances exist, a number of factors are to be considered. Among the factors to be considered are: (1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is a strong reason to believe that the suspect is within the premises to be searched, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, i.e., whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or a danger to police or other persons inside or outside the dwelling.

*Richter*, *supra*, 791 A.2d at 1184-1185, *quoting* **Commonwealth v. Santiago**, 736 A.2d 624, 631-632 (Pa. Super. 1999).

Here, the PCRA court concluded the facts present in this case "overwhelmingly" established exigent circumstances justifying the officers' warrantless entry into Matthews' home. The court opined:

Officer Celce received a radio call for a shooting and person with a gun at 2603 West Harold Street in Philadelphia. Only four (4) blocks away, the officer immediately converged on that location, where he observed bullet holes in the windows and encountered the complainant, Enoch Carter. Mr. Carter – who was well familiar with [Matthews] and had just witnessed [Matthews] ordering Dozier to shoot him – directed Officer Celce to [Matthews'] residence, which was just around the corner. "Not even 30 seconds" later, he knocked on, and [Matthews] answered, the door; Dozier was seated on a couch directly facing the front door of the residence. As soon as Mr. Carter saw Dozier, he yelled and pointed to him, "[T]hat's the guy". Upon removing Dozier from the couch, Officer Celce lifted the cushion were Dozier was sitting

- 15 -

and recovered a handgun; Dozier was "sitting on" the gun. Thus, nearly each of the above factors, with the exception perhaps of "time of the entry", weighs in favor of exigency. Accordingly, the police activity was justified in this case.

PCRA Court Opinion, 7/17/2018, at 14-15 (footnote omitted).

We agree with the ruling of the PCRA court. Officer Celce responded to the radio call of a shooting very quickly, and immediately he spoke with Carter, the victim, who directed him to Matthews' residence. See N.T. 4/21/2015, at 87-90. At that point, the officer was investigating a serious offense (a shooting), had reason to believe the suspect was armed, and had reason to believe the suspect would be in Matthews' home. Officer Celce knocked on the door and waited for Matthews to answer. *See id.* at 90-91. When he did, the officer testified he could see Dozier sitting on a couch. *See id.* at 91. Carter, who was standing behind the officer, immediately pointed at Dozier and said, "that's the guy who shot at my house." *Id.* Officer Celce then entered the home and arrested Dozier. He noticed Dozier had his hand between his legs when he was sitting on the couch. *See id.* at 92. When he picked up Dozier off the couch, he could see a firearm under the cushion. Therefore, he flipped the cushion and retrieved the gun. *See id.* at 134-135. We agree that under these facts, Officer Celce was presented with exigent circumstances to enter the residence and arrest Dozier. Moreover, when he saw the gun in the couch, based upon the fact there were other individuals present, the officer acted properly when he removed the cushion and seized the weapon. Therefore, because Matthews' suppression claim has no arguable merit, we find trial counsel was not ineffective for failing to pursue a

suppression motion, and the PCRA court did not abuse its discretion when it declined to conduct an evidentiary hearing on this baseless claim. ***See Michaud***, ***supra***.

In his final argument, Matthews contends the PCRA court abused its discretion when it failed to grant relief on his claim that the trial court should have issued a curative instruction when Dozier's confession was introduced at trial. ***See*** Matthews' Brief at 15-16. He maintains the Commonwealth used the evidence of Dozier's guilt to establish his conspiracy conviction, and failed to provide any "cautionary or limiting instructions to the jury to prevent confusion or misuse of the evidence." ***Id.*** at 16.

We find this claim is derivative of an issue that was raised, and rejected, on direct appeal. In his prior appeal, Matthews raised a ***Bruton***[12] claim, arguing his "rights under the Confrontation Clause were violated when the trial court permitted the Commonwealth to introduce a statement of Dozier that implicated him in the shooting." ***Matthews***, ***supra***, 153 A.3d 180 [2468 EDA 2015 at *3]. The statement at issue was made by Dozier in a recorded prison phone call with Matthews. ***See id.*** However, a panel of this Court found no ***Bruton*** violation because Dozier's "vague" statement "did not explicitly reference or facially incriminate [Matthews] in any way." ***Id.*** at *4.

In this appeal, Matthews contends the trial court erred when, absent a request by counsel, it failed to provide a limiting instruction as to the use of

---

[12] ***Bruton v. United States***, 391 U.S. 123 (1968).

that same statement, *sua sponte*.  **See** Matthews' Brief at 15-16.  This claim fails for two reasons.  First, an allegation of trial court error, as opposed to a claim that counsel was ineffective, could have been raised on direct appeal. Therefore, this issue is waived.  **See** 42 Pa.C.S. §§ 9543(a)(3) and 9544(b). Second, because a prior panel of this Court found Dozier's statement did not incriminate Matthews "in any way," there was no reason for the trial court to provide a limiting or cautionary instruction.  **Matthews**, **supra**, 153 A.3d 180 [2468 EDA 2015 at *4].  In fact, the panel noted that Dozier's statement was so vague that it did not even "rise to being an admission" of his own criminal conduct.  **Id.**  Accordingly, Matthews' present assertion of trial court error fails.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/7/19